FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:18CR 116-MHT |
| | ) | [18 U.S.C. § 371; |
| G. FORD GILBERT, | ) | 18 U.S.C. § 666; |
| MARTIN J. CONNORS, and | ) | 18 U.S.C. § 1343; |
| JACK D. WILLIAMS | ) | 18 U.S.C. § 1346; |
| | ) | 18 U.S.C. § 1347; |
| | ) | 18 U.S.C. § 1349; |
| | ) | 18 U.S.C. § 1952; |
| | ) | 18 U.S.C. § 2] |
| | ) | |
| | ) | INDICTMENT |

The Grand Jury charges:

## I. INTRODUCTION

At all times relevant to this Indictment:

1.      Trina Health, LLC (Trina Health) was a domestic limited liability company registered with the Secretary of State of Nevada on or about March 24, 2014. Trina Health was headquartered in McClellan Park, California. Trina Health operated, through license agreements, outpatient diabetes treatment clinics.

2.      Bionica, Inc. (Bionica) was a domestic corporation registered with the Secretary of State of Nevada on or about June 25, 1999. Bionica was headquartered in McClellan Park, California. Bionica manufactured pumps that were then purchased by franchisees of Trina Health and used in Trina Health outpatient diabetes treatment clinics.

3.      Defendant G. Ford Gilbert, a California resident, was the founder and president of Trina Health and Bionica. In or about 1975, Gilbert obtained a juris doctor degree and became a practicing attorney in California. Subsequently, Gilbert attended medical school, but did not

graduate. He later obtained a doctor of philosophy degree from an online educational institution. Gilbert claimed that he developed the pump-based treatment provided at Trina Health clinics.

4.     Defendant Martin J. Connors was a resident of Alabama and a registered lobbyist with the Alabama Ethics Commission. Connors was also the former chairman of the Alabama Republican Party.

5.     Defendant Jack D. Williams was member of the Alabama House of Representatives. Williams, a Republican, represented House District 47, which consisted of portions of Jefferson County, Alabama. Williams was the chairman of the Commerce and Small Business Committee of the House of Representatives.

6.     M.H. was a member of the Alabama House of Representatives. M.H., a Republican, represented House District 4, which consisted of portions of Limestone and Morgan Counties, Alabama. From in or about 2010 until in or about 2017, M.H., a Republican, was the majority leader of the House of Representatives. M.H. was also a member of the Commerce and Small Business Committee, chaired by Defendant Williams. As a member of the Alabama Legislature, M.H. was an agent of the state of Alabama.

7.     Blue Cross Blue Shield of Alabama (BCBS-AL) was a nonprofit, private health insurance company headquartered in Birmingham, Alabama. BCBS-AL provided coverage to over 3,000,000 people. That consisted of over 90 percent of the total market for health insurance in Alabama.

8.     Alabama was a state. The government of the state of Alabama received federal assistance in excess of $10,000 during the one-year period beginning January 1, 2015 and ending December 31, 2015. The government of the state of Alabama again received federal assistance in excess of $10,000 during the one-year period beginning January 1, 2016 and ending December

31, 2016.

## II.  ALABAMA LEGAL BACKGROUND

At all times relevant to this Indictment:

9.      Title 36, Section 36-25-5.1(a) of the Code of Alabama provided, "No lobbyist, subordinate of a lobbyist, or principal shall offer or provide a thing of value to a public employee or public official or to a family member of the public employee or family member of the public official;  and no public employee or public official or family member of the public employee or family member of the public official shall solicit or receive a thing of value from a lobbyist, subordinate of a lobbyist, or principal."

10.     Title 36, Section 36-25-1(27) of the Code of Alabama provided, whenever used in Chapter 25 of Title 36 of the Code of Alabama (consisting of the above-described sections), the phrase "public official" meant: "Any person elected to public office, whether or not that person has taken office, by the vote of the people at state, county, or municipal level of government or their instrumentalities, including governmental corporations, and any person appointed to a position at the state, county, or municipal level of government or their instrumentalities, including governmental corporations.

## III.  BACKGROUND EVENTS

A.      Trina Health's Artificial Pancreas Treatment

11.     At its clinics, health care providers affiliated with Trina Health or a Trina Health licensee provided "artificial pancreas treatment."  This treatment, as described in Trina Health promotional materials, entailed a process described as "Microburst Insulin Infusion."  This process required a patient to spend three hours in a chair at a Trina Health outpatient clinic. During those three hours, the patient received, through intravenous injection, a series of

injections of insulin.  The Bionica pump was used to administer these intravenous insulin injections.  Trina Health recommended that a patient undergo this artificial pancreas treatment once per week in order for the patient to see beneficial health outcomes.  In promotional materials, Trina Health stated that the artificial pancreas treatment could be used to treat more than diabetes.  Among the other conditions that Trina Health claimed that artificial pancreas treatment could treat were: neuropathy, hypoglycemia, hypertension, chronic fatigue, wounds, and erectile dysfunction.

12.    On or about March 23, 2009, the Centers for Medicare and Medicaid Services (CMS) issued a decision memorandum stating that CMS had determined that "evidence [did] not support a conclusion that outpatient intravenous insulin therapy improves health outcomes in Medicare beneficiaries."  Accordingly, CMS stated that it would not cover the cost of such therapy, like the artificial pancreas treatment provided by Trina Health.  In explaining its reasoning for denying coverage, CMS noted that the Food and Drug Administration (FDA) had not approved outpatient intravenous insulin injection therapy for treating diabetes.  CMS also pointed out that clinical studies had not indicated conclusively the benefits of the treatment.  Many private health care benefit plans generally follow CMS's coverage determinations.

13.    Around the time that it issued the non-coverage decision memorandum, CMS assigned a Healthcare Common Procedure Coding System (HCPCS) code for outpatient intravenous insulin injection therapy.  That code was G9147.  CMS instructed health care providers to use that code when submitting claims for outpatient intravenous insulin injection therapy.  Because the first character in the code was "G," the CMS computer systems would recognize the code as being for a non-covered treatment and then deny the claim.  Private health care benefit programs generally required health care providers to use HCPCS codes when

4

submitting claims. Those programs also would deny claims that began with the symbol "G."

14.     After CMS issued its non-coverage decision memorandum, Trina Health continued to enter into license agreements with individuals and businesses. Those agreements authorized the licensees to open Trina Health-affiliated clinics in designated geographic locations. The agreements obligated the licensees to pay Trina Health fixed sums for each new clinic established, fixed sums for each chair installed within a new clinic, and percentages of annual gross profits. Trina Health also required licensees to purchase pumps from Bionica for use in the Trina Health-affiliated clinics and to pay Trina Health fees for Trina Health performing billing services for the health care providers in the clinics. By 2015, Trina Health-affiliated clinics operated in various places, including California, Mississippi, Arizona, Nevada, and India.

B.     Trina Health's Expansion Into Southern Alabama

15.     In or about 2014, Trina Health entered into a license agreement with CP Homes, LLC (CP Homes), a Texas corporation for CP Homes to open Trina Health-affiliated clinics in southern Alabama. At this time, CP Homes's primary business was operating assisted living and memory-care residences in Texas and Alabama. Thereafter, CP Homes opened two Trina Health-affiliated clinics in Baldwin County, Alabama. One of those clinics was in Foley, Alabama and the other was in Fairhope, Alabama.

16.     Although CMS and BCBS-AL did not reimburse for the costs of outpatient intravenous insulin injection therapy, the Foley and Fairhope Trina Health-affiliated clinics initially generated revenue. The clinics were profitable because the Trina Health billing employees refrained from using the HCPC code of G9147 on the claims they submitted to CMS, BCBS-AL, and other health care benefit programs. Rather, they submitted claims using the

codes assigned to the component parts of the treatment. As a result of the submission of these claims, health care benefit programs paid around $600 per three-hour treatment session.

C.     Preparations for Trina Health's Expansion Into Northern Alabama

17.     In or about 2015, C.B., a Georgia resident, and a group of investors formed Trina Health Care Partners, LLC (THCP). THCP was a Wyoming limited liability corporation officially formed in or about February of 2015. Soon after its formation, THCP entered into a license agreement with Trina Health. Under that agreement, THCP acquired exclusive rights to open clinics in Alabama (outside of Baldwin County), Florida, Georgia, Mississippi, the southern portion of Louisiana, Texas, South Carolina, New Mexico (outside of Albuquerque), Wyoming, Illinois, Wisconsin, Virginia, Pennsylvania, and Boise, Idaho. For these rights, THCP agreed to pay Trina Health: (1) $100,000 for each new clinic established; (2) fees of $16,000 for each chair installed in each new clinic (with each clinic having a minimum of 12 chairs); and (3) a royalty fee of 5 percent of the gross revenues of each clinic. THCP also agreed to pay an additional 5 percent of gross revenues to Trina Health in exchange for Trina Health performing billing services for TCHP's Trina Health-affiliated clinics.

18.     In or about June of 2015, C.B. and other investors formed THCP Bham AL 1, LLC (THCP Bham), a Wyoming limited liability corporation and a subsidiary of TCHP. THCP Bham existed to operate, as a sub licensee of THCP, a Trina Health-affiliated clinic in the metropolitan area surrounding Birmingham, Alabama. C.B. was the president of THCP Bham.

19.     In or about 2014, as C.B. planned to form these entities, he recruited M.H. into the business. To do so, C.B. took M.H. to the Baldwin County Trina-affiliated clinics. There, M.H. met with Defendant Gilbert. Defendant Gilbert attempted to convince M.H. to invest in C.B.'s business. C.B. then gifted M.H. an ownership interest in THCP. M.H. paid nothing for

that ownership interest.  Rather, in exchange for the ownership interest, M.H. agreed to:
(1) solicit investment funds from other investors within Alabama and elsewhere (which could result in M.H. retaining a "finder's fee"); (2) identify a suitable location within the Birmingham area for a Trina Health affiliated clinic; (3) negotiate a lease for the clinic space; and (4) perform the site improvements necessary for the opening and operation of the clinic.

20.     M.H. performed these tasks throughout in or about the late part of 2014 and in or about the first half of 2015.  During this time, Defendant Gilbert, as president of the licensor, Trina Health, closely supervised M.H.'s work.  When THCP Bham lacked sufficient funding to prepare to open the clinic, Gilbert secured funding for the clinic.  Gilbert assured M.H., C.B., and other investors in THCP Bham that, when the clinic opened, the clinic would be immediately profitable.  Gilbert stated that public and private health care benefit programs would pay claims submitted for services provided at the new clinic.

21.     Defendant Gilbert knew that this was not true.  In or about May of 2015, BCBS-AL realized that Trina Health was erroneously omitting the proper HCPC code from bills submitted for the services provided at the Baldwin County clinics.  Accordingly, BCBS-AL sent letters to the health care providers associated with the claims requesting that those providers: (1) begin using the applicable HCPC code; and (2) repay money erroneously paid by BCBS-AL based upon the incorrect claims.  BCBS-AL estimated that, at that time, it had erroneously paid $40,000 for the non-covered outpatient intravenous insulin injection therapy.  Gilbert was aware of these letters.  Trina Health, at Gilbert's direction, paid the money requested by BCBS-AL.

22.     In or about August of 2015, Defendant Gilbert revealed to the investors in THCP Bham, including M.H. and C.B., that BCBS-AL would likely refuse to reimburse for the treatment that would be provided at the new clinic.  Gilbert assured the investors that he was

capable of causing BCBS-AL to reconsider its position.

23.     As M.H. assisted in the preparations for the opening of the Trina Health-affiliated clinic in the Birmingham area, Trina Health and THCP made payments to M.H. Between in or about May of 2015 and in or about September of 2015, M.H. received, by way of wire transfers, a total of $12,500 from Trina Health. During that same period, M.H. received, by way of wire transfers, a total of $16,289.23 from THCP and THCP Bham. Defendant Gilbert was aware of, and funded, in all or in part, these wire transfers.

D.     The Opening and Early Operations of the Hoover, Alabama Trina Health-Affiliated Clinic

24.     On or about September 15, 2015, a Trina Health-affiliated clinic opened in Hoover, Alabama. This clinic was owned by THCP Bham and operated under the THCP license agreement with Trina Health. Defendant Gilbert attended the grand opening. At the request of M.H., the governor of Alabama, Robert Bentley, attended the ceremony. Bentley personally cut the ribbon to open the clinic.

25.     Three days later, on or about September 18, 2015, M.H. deposited into his personal bank account a check from THPC Bham in the amount of $35,320.

26.     The clinic immediately found itself in dire financial straits. BCBS-AL refused to cover claims submitted by the clinic. In an effort to disguise the claims, Trina Health attempted to use alias business names on the claims. Nevertheless, BCBS-AL denied coverage. To keep the clinic operational, Defendant Gilbert arranged for additional funding for the clinic.

27.     In an effort to force BCBS-AL to reimburse for the artificial pancreas treatment provided at Trina Health-affiliated clinics, Defendant Gilbert formed what he named the "BlueGate Coalition." In promotional materials, Gilbert described this group as "an unincorporated association helping victims and fighting insurance abuses." The group's slogan

8

added that "membership is free and confidential." In a letter sent to various individuals, including M.H., Gilbert described a plan of action. Components of that plan included: (1) launching a public opinion campaign; (2) filing a complaint in the Circuit Court of Baldwin County alleging state law tort claims; (3) filing a complaint in a federal court alleging claims under the Racketeer Influenced and Corrupt Organizations Act and the Employee Retirement Income Security Act; (4) obtaining the support of unions and other labor organizations, including the Alabama Education Association; and (5) advocating for the enactment of a state law that would require BCBS-AL to cover the artificial pancreas treatment.

28.     In or about November and December of 2015, Defendant Gilbert attended meetings with BCBS-AL officials at the BCBS-AL office in Birmingham. During those meetings, Gilbert tried to convince the BCBS-AL officials to cover the artificial pancreas treatment. The officials refused. At one of the meetings, Gilbert informed the officials that the Alabama Legislature would likely intervene on behalf of Trina Health and its licensees.

## IV. THE CHARGES

### COUNT 1
(Conspiracy)

29.     The factual allegations contained in paragraphs 1 through 28 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

30.     Beginning in or about May of 2015 and continuing until in or about May of 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

G. FORD GILBERT,
MARTIN J. CONNORS, and
JACK D. WILLIAMS,

as well as others, both known and unknown, did knowingly and intentionally conspire, combine, and agree with themselves and others, to commit offenses against the United States, specifically,

bribery concerning a program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(2).

OVERT ACTS

31.    In furtherance of the conspiracy, a defendant took one or more of the overt acts described below.

A.    The Hiring of Defendant Connors

32.    In or about January of 2016 and February of 2016, Defendant Gilbert sent a series of electronic mail messages to various officials of BCBS-AL.  In those messages, Gilbert implored the officials to reconsider their positions.  He also accused the officials of extortion and intentionally causing sickness among the people of Alabama.  Gilbert blind carbon copied M.H. on each of these messages.

33.    In or about early 2016, T.G., an official of CP Homes (the owner of the Baldwin County clinics), hired a lobbyist to advocate for the enactment of a bill that would solve Trina Health's problems in Alabama.  T.G. did so at Gilbert's direction.  That lobbyist was Defendant Connors.  Connors was aware of M.H.'s financial interest in and ongoing receipt of payments from Trina Health and the licensees of Trina Health.

34.    During in or about early 2016, Defendant Gilbert and Defendant Connors frequently communicated with M.H. regarding the introduction into the Alabama Legislature a bill that would require BCBS-AL to reimburse for artificial pancreas treatment provided at Trina Health-affiliated clinics.  M.H. informed Gilbert and Connors that his overt involvement in any legislation that would directly benefit Trina Health would be illegal.  M.H. suggested that Gilbert and Connors consult with another member of the Alabama House of Representatives—M.H.'s longtime friend, Defendant Williams.

B.      Gilbert's Offer to Repay M.H.'s Debt

35.      Meanwhile, throughout his involvement with Trina Health, M.H. endured severe financial hardship.  In or about February of 2016, M.H. owed Regions Financial Corporation (Regions) approximately $240,000.  M.H. informed Defendant Gilbert of the maturation of this outstanding debt obligation.

36.      Thereafter, in or about February of 2016, Defendant Gilbert spoke over the telephone with an attorney, K.G., representing Regions in the debt collection matter involving M.H.  Gilbert told K.G. that M.H. was about to receive a large sum of money through a successful business venture.  Gilbert requested that Regions extend the repayment period.

37.      On or about February 13, 2016, Defendant Gilbert sent an electronic mail message to K.G., the attorney representing Regions.  Gilbert blind carbon copied M.H. on the message.  Gilbert wrote, "[M.H.] has been working on the massive diabetes problem of Alabama for over a year.  Through his funding and associates, he was able to get our company to open 3 clinics in Alabama, (Hoover, Fairhope and Foley)."  As Gilbert then knew, this statement was partially false.  M.H. had not provided any funding used to open or operate a Trina Health-affiliated clinic.  Moreover, M.H. had not had any involvement in the opening of the Baldwin County clinics.  Later in the message, Gilbert assured K.G. that Trina Health would soon become profitable.  Gilbert closed the message by writing, "Please allow me to facilitate payment that is helpful for all."

38.      Soon after Defendant Gilbert sent the above-described electronic mail message to K.G., M.H. sent an electronic mail message to Gilbert.  M.H. wrote, "Great letter.  Thank you Ford."

39.      On or about March 1, 2016, Defendant Gilbert sent another message to K.G.  In

that message, Gilbert appeared to offer that Trina Health would repay M.H.'s debt. Gilbert wrote that he was "ready to write the instructions from the Bank to Trina Health for Trina to pay the Bank first, with an ongoing payment plan at the same time."

40.     Throughout this period, during private conversations, Defendant Gilbert assured M.H. that, as soon as Trina Health or Gilbert had sufficient funds, payment of M.H.'s debt to Regions would be made. M.H. understood this promise to be related to Gilbert's efforts to persuade M.H. to facilitate the enactment of a bill to require BCBS-AL to cover the artificial pancreas treatment.

C.     The Drafting of the Bill

41.     During in or about February and March of 2016, Defendant Gilbert drafted a bill to be introduced in the Alabama Legislature that would require health care benefit programs operating in Alabama, including BCBS-AL, to reimburse for the costs of outpatient intravenous insulin injection therapy, including Trina Health's artificial pancreas treatment.

42.     In or about February of 2016, Defendant Gilbert had dinner at a Birmingham restaurant with Defendant Williams. During that dinner, they discussed the bill that Gilbert wanted introduced and enacted. Williams informed Gilbert that he (Williams) would ensure that the bill was assigned to the committee he chaired, the Commerce and Small Business Committee. Williams further promised that, once the bill was assigned to his committee, Williams would hold a hearing on the bill. It was Williams's hope that the holding of a hearing would cause BCBS-AL to consent to Trina Health's demands.

43.     Defendant Williams attended the dinner with Defendant Gilbert and made the above-described promises aware of: (1) M.H.'s financial interest in licensees of Trina Health and his receipt of payments from those licensees; and (2) M.H.'s ongoing financial difficulties.

12

Williams, thus, knew that enactment of the bill or a negotiated settlement of the issue would be of financial benefit to M.H.  After Williams attended the dinner with Gilbert, Williams spoke with M.H. over the telephone.  During that conversation, Williams conveyed to M.H. the promises Williams had made to Gilbert.

44.     Meanwhile, Defendant Connors worked to find a sponsor for the bill and to get the bill to the floor of the House of Representatives.  On or about March 1, 2016, Connors approached M.H. before a political fundraiser event held in honor of a United States Senator. Connors asked M.H. if M.H. would present or authorize the presenting of Defendant Gilbert's draft bill to the Legislative Reference Service.  As Connors and M.H. then knew, to be introduced in a chamber of the Alabama Legislature, a draft bill had to be presented to the Legislative Reference Service for the employees of that office to put the draft bill into the appropriate format.  Only a member of the Alabama Legislature, or someone specifically authorized by a member, could present a bill to the Legislative Reference Service.  M.H. declined to present the bill to the Legislative Reference Service or to authorize Connors to present the bill on his behalf.  M.H. suggested that Connors obtain Defendant Williams's authorization to present the bill.

45.     Later, on or about March 1, 2016, Connors sent an electronic mail message to Gilbert (and others) stating that he (Connors) "had a strategic chat with the Majority Leader tonight before [Connors] got to the Senator Shelby event."  The message went on to state that the majority leader advised that the bill should be assigned to "Commerce (Williams)."  Connors suggested that Gilbert schedule a conference call and then closed by writing, "I'll talk to Leader."  Gilbert scheduled a conference call for the next day.  He did so by sending out an electronic mail message to Connors and others interested in the bill.  He blind carbon copied

M.H. on that message.  Importantly, as noted, M.H. was the majority leader of the House of Representatives when Connors sent the March 1, 2016 electronic mail message.

46.      Thereafter, in or about March of 2016, Defendant Connors obtained Williams's authority to present the draft bill (which Defendant Gilbert had drafted) to the Alabama Legislative Reference Service.  The employees of the Legislative Reference Service ensured that the draft bill was put into an appropriate format.  Connors then enlisted the help of R.J., a member of the Alabama House of Representatives.  R.J. agreed to sponsor the bill.

D.      The Introduction of H.B. 415

47.      On or about March 15, 2016, the bill was introduced onto the floor of the Alabama House of Representatives.  The bill was captioned House Bill (H.B.) 415.  At Williams's request, the speaker of the Alabama House of Representatives, Michael Hubbard, assigned the bill to the committee chaired by Williams, the Commerce and Small Business Committee.  When a member of the committee asked Williams why Speaker Hubbard had assigned the bill to the Commerce and Small Business Committee instead of the Health Committee or the Insurance Committee, Williams stated that he (Williams) was trying to "help out" M.H.

48.      On or about March 23, 2016, Defendant Gilbert traveled to Montgomery, Alabama and attended a lunch meeting of the Alabama House of Representatives Republican Caucus.  Gilbert attended that meeting as the invited guest of M.H.  At the time Gilbert attended the meeting, H.B. 415—the bill written by Gilbert and backed by Trina Health—was pending before the Commerce and Small Business Committee.

E.      Committee Hearing on H.B. 415

49.      After Speaker Hubbard assigned the bill to the committee chaired by Defendant

Williams, Williams scheduled a hearing on the bill for April 13, 2016.

50.     On or about April 2, 2016, Defendant Gilbert sent an electronic mail message to the physicians who had worked at the Baldwin County Trina Health-affiliated clinics.  Gilbert copied C.B., the lead investor in THCP Bham, and T.G., a principal in CP Homes, the owner of the Baldwin County Trina Health-affiliated clinics.  The subject line of the email was "Our Bill." Gilbert blind carbon copied M.H.  In the message, Gilbert informed the recipients of the date of the hearing and he asked the recipients to help to create "such a newsworthy event" that BCBS-AL would "recant" or the bill would advance out of the committee.

51.     On or about April 11, 2016, Defendant Gilbert traveled from Mexico to Montgomery, Alabama.  He then sent an electronic message to Defendant Williams, C.B., and others informing the recipients of his arrival.  Gilbert blind carbon copied M.H. on this message.

52.     On or about April 13, 2016, before the scheduled hearing, Defendant Gilbert, Defendant Williams, Defendant Connors, and M.H. met in a conference room located within the Alabama State House.  During that meeting, the men strategized as to how the hearing might go. M.H. offered his advice.  Williams speculated that the hearing could be used as a tool to force BCBS-AL to negotiate with Trina Health and its licensees.  Williams sought a resolution in part because such a resolution would result in the payment of money to M.H. in the form of royalties and other payments.

53.     Thereafter, on or about April 13, 2016, Defendant Williams presided over a hearing of the Alabama House of Representatives Commerce and Small Business Committee on H.B. 415.  Defendant Connors attended the hearing.  M.H. did not physically attend the meeting. Rather, he stood in the hallway outside of the meeting room and tried to eavesdrop on the proceedings.  During those proceedings, a physician employed by BCBS-AL spoke against the

bill.  Defendant Gilbert spoke in favor of the bill.

54.     After the meeting, Defendant Connors sent to a clerical employee of the House of Representatives, by electronic mail message, promotional materials related to Trina Health. Connors then forwarded this sent message to Defendant Gilbert's assistant.  The assistant sent the message to Gilbert and M.H.

55.     On or about April 18, 2016, Trina Health and CP Homes jointly hired a second lobbyist, C.M.  On or about that date, C.M. filed documents with the Alabama Secretary of State registering himself as a lobbyist for Trina Health and CP Homes.  On that document, C.M. listed Trina Health as a principal.  On or about April 17, 2016, Defendant Gilbert signed a document confirming that Trina Health was a principal and that C.M. was its registered lobbyist.

F.     The Failure of H.B. 415 and Final Payment to M.H.

56.     On or about April 22, 2016, Defendant Gilbert sent an electronic mail message to BCBS-AL's lead in-house physician.  In the subject line, Gilbert wrote "personal please." Gilbert blind carbon copied M.H.  In the message, Gilbert wrote that Trina Health had secured the votes necessary to advance H.B. 415 out of committee and that "some of the legislators suggested that [Trina Health] try to negotiate with BCBSAL on a resolution."  Gilbert claimed that he was "doing as asked" and then proposed financial terms under which BCBS-AL might cover artificial pancreas treatment.

57.     The bill failed to advance out of the Commerce and Small Business Committee before the end of the 2016 legislative session.

58.     On or about April 29, 2016, M.H. deposited into his personal checking account a check issued by Trina Health in the amount of $2,000.

G.     Gilbert's Efforts to Introduce a Bill During the 2017 Legislative Session

59.     In or about May of 2016, Defendant Gilbert began making efforts to have a new bill introduced during the 2017 session of the Alabama Legislature that would require that BCBS-AL cover outpatient intravenous insulin injection therapies like the artificial pancreas treatment offered by Trina Health and its licensees.

60.     To do so, in or about May of 2016, Defendant Gilbert contacted M.H. and asked M.H. to support a bill that would be introduced during the 2017 legislative session.

61.     In or about May of 2016, M.H. meanwhile was still attempting to repay the money he owed Regions.  Defendant Gilbert sent M.H. an electronic mail message in which Gilbert offered to pay "all fees due" by M.H. to Regions.

62.     M.H. refused to support another bill.  In or about February of 2017, M.H. resigned as the majority leader of the Alabama House of Representatives.  In or about September of 2017, M.H. resigned from the House of Representatives.

63.     In or about 2017, the three Trina Health-affiliated clinics located in Alabama closed.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
(Bribery Concerning a Program Receiving Federal Funds)

64.     The factual allegations contained in paragraphs 1 through 63 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

65.     Beginning in or about May of 2015 and continuing until in or about May of 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

G. FORD GILBERT and
MARTIN J. CONNORS,

17

each aiding and abetting another, and each aiding and abetting another, did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward M.H. in connection with a transaction and series of transactions of Trina Health and BCBS-AL involving $5,000 or more. All in violation of Title 18, United States Code, Section 666(a)(2) and Title 18, United States Code, Section 2.

COUNT 3
(Conspiracy to Commit Honest Services Wire Fraud)

66.     The factual allegations contained in paragraphs 1 through 65 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

67.     Beginning on an unknown date and continuing until in or about May of 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

G. FORD GILBERT,
MARTIN J. CONNORS, and
JACK D. WILLIAMS,

did knowingly and willfully conspire, combine, and agree with themselves and others, both known and unknown, including M.H., to devise and intend to devise a scheme to defraud and to deprive the citizens of Alabama of the intangible right to honest services of a public official; that is, to deprive the citizens of Alabama of the honest services of M.H., an elected member of the Alabama House of Representatives and the majority leader of that body, and Defendant Williams, an elected member of the Alabama House of Representatives, in violation of Title 18, United States Code, Sections 1343 and 1346. All in violation of Title 18, United States Code, Section 1349.

COUNT 4
(Honest Services Wire Fraud Scheme)

68.     The factual allegations contained in paragraphs 1 through 72 of this Indictment

18

are hereby realleged and incorporated herein as if copied verbatim.

## THE SCHEME

69.     Beginning on an unknown date and continuing until in or about May of 2016, in

Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

G. FORD GILBERT,
MARTIN J. CONNORS, and
JACK D. WILLIAMS,

each aiding and abetting another, and each aiding and abetting another, did devise and intend to

devise a scheme and artifice to defraud and to deprive the citizens of Alabama of the intangible

right to honest services of a public official; that is, to deprive the citizens of Alabama of the

honest services of M.H., an elected member of the Alabama House of Representatives and the

majority leader of that body, and Defendant Williams, an elected member of the Alabama House

of Representatives.  The scheme and artifice are set forth below.

## MANNER AND MEANS

It was part of the scheme that:

70.     Defendant Gilbert offered and gave things of value to M.H., and M.H. accepted

those things of value from Gilbert.  Among the things of value given by Gilbert were: money and

offers to directly repay creditors of M.H.'s on M.H.'s behalf.  Gilbert gave some of these things

of value to M.H. through Trina Health and entities affiliated with Trina Health.

71.     M.H. took steps to conceal these payments.  For example, on his statements of

economic interest filed with the Alabama Ethics Commission, M.H. did not disclose his

affiliation with THCP Bham,  THCP, or Trina Health.

72.     Defendant Gilbert offered and gave these things of value to M.H. for the purpose

of inducing M.H. to take official action that would benefit Trina Health, or to cause another

public official to take official action that would benefit Trina Health. Specifically, Gilbert sought for M.H. to sponsor and support or to cause another member of the Alabama House of Representatives to sponsor and support a bill that would require BCBS-AL to cover and reimburse for costs associated with outpatient intravenous insulin injection therapy.

73.     Defendant Connors acted to assist Defendant Gilbert in convincing M.H. to take official action that would benefit Trina Health, or to cause another public official to take official action that would benefit Trina Health.

74.     Knowing that Trina Health had offered and given things of value to M.H., and that M.H. would receive additional things of value if BCBS-AL covered outpatient insulin injection treatment, Defendant Williams took official action to support the Trina Health bill. Williams did so, in part, because of the benefit that would be conferred on M.H. as a result of the official action. Among the actions taken by Williams were: (1) causing the draft bill to be accepted by the Legislative Reference Service; (2) causing the introduced bill, H.B. 415, to be assigned to the committee chaired by Williams; and (3) scheduling a hearing on H.B. 415 before the committee Williams chaired.

75.     In furtherance of the scheme, the defendants sent and received wire communications in interstate commerce, specifically, electronic mail messages.

All in violation of Title 18, United States Code, Sections 1343 and 1346 and Title 18, United States Code, Section 2.

## COUNTS 5 THROUGH 11
### (Honest Services Wire Fraud)

76.     The factual allegations contained in paragraphs 1 through 75 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

77.     On or about the dates set forth below, in Montgomery County, within the Middle

District of Alabama, and elsewhere, the defendants,

G. FORD GILBERT and
MARTIN J. CONNORS,

each aiding and abetting another, and each aiding and abetting another, for the purpose of

executing the scheme and artifice to defraud the citizens of Alabama of their intangible right to

honest services, and attempting to do so, as described in count 4 of this Indictment, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds

described below for each count, each transmission constituting a separate count:

| COUNT | ON OR ABOUT DATE | DEFENDANT CHARGED | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|---|
| 5 | February 13, 2016 | GILBERT | Electronic mail message sent by Defendant Gilbert to K.G., an attorney representing Regions, in which Gilbert offered to "facilitate payment" of M.H.'s outstanding debt owed to Regions |
| 6 | March 2, 2016 | CONNORS | Electronic mail message sent by Defendant Connors to Defendant Gilbert and others describing a "strategic chat with Majority Leader" |
| 7 | March 2, 2016 | GILBERT | Electronic mail message sent by Defendant Gilbert to Defendant Connors and M.H. scheduling |

| | | | |
|---|---|---|---|
| | | | a conference call for March 3, 2016 for the purposes of discussing the introduction of a bill that would benefit Trina Health |
| 8 | April 4, 2016 | GILBERT | Electronic mail message sent by Defendant Gilbert to M.H., C.B., and others discussing strategy for the upcoming committee meeting; the subject line was "Our Bill" |
| 9 | April 11, 2016 | GILBERT | Electronic mail message sent by Defendant Gilbert to M.H., Defendant Williams, and Defendant Connors stating that Gilbert had arrived in Montgomery for the committee hearing |
| 10 | April 29, 2016 | GILBERT | Wire transfer of $2,000 from a financial institution account belonging to Trina Health to a personal account of M.H. |
| 11 | May 12, 2016 | GILBERT | Electronic mail message to M.H. requesting information about M.H.'s debt obligation owed to Regions |

Each in violation of Title 18, United States Code, Sections 1343 and 1346 and Title 18, United States Code, Section 2.

## COUNT 12
### (Health Care Fraud)

78.     The factual allegations contained in paragraphs 1 through 77 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

79.     On or about April 22, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

### G. FORD GILBERT,

aiding and abetting another, and aided and abetted by another, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud and to obtain by means of materially false and fraudulent pretenses, representations, and promises, to wit: the assertion that Trina Health had secured the necessary votes to advance H.B. 415 out of committee, money and property owned by and under the custody and control of BCBS-AL, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347 and Title 18, United States Code, Section 2.

## COUNT 13
### (Wire Fraud)

80.     The factual allegations contained in paragraphs 1 through 72 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

81.     On or about April 22, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

### G. FORD GILBERT,

aiding and abetting another, and aided and abetted by another, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

82.     In furtherance of that scheme, Gilbert sent, by wire communication in interstate commerce, an electronic mail message to an employee of BCBS-AL.  In that electronic mail message, Gilbert stated that Trina Health had secured the votes necessary to advance H.B. 415 out of the Commerce and Small Business Committee.  As Gilbert then knew, this statement was false.

83.     Gilbert made this false statement in hopes of inducing BCBS-AL to voluntarily agree to cover the artificial pancreas treatment provided by Trina Health and its licensees.

All in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

COUNT 14
(Interstate Travel in Aid of Racketeering)

84.     The factual allegations contained in paragraphs 1 through 83 of this Indictment are hereby realleged and incorporated herein as if copied verbatim.

85.     On or about April 11, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,

traveled in interstate and foreign commerce from Mexico to Montgomery, Alabama with the intent to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: bribery involving a principal of a lobbyist, in violation of Title 36, Section 36-25-5.1(a) of the Alabama Code and bribery concerning a program receiving federal funds, in violation of Title 18, United States Code,

24

Section 666(a)(2), as alleged in count 2 of this Indictment, and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity.  All in violation of Title 18, United States Code, Section 1952(a)(3).

FORFEITURE ALLEGATION-1

A.     The allegations contained in counts 1 through 11, 13 and 14 of this indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

B.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 371, 666(a)(2), 1343, 1346, 1349 and 1952(a)(3), set forth in counts 1 through 11, 13 and 14 of this indictment, the defendants,

G. FORD GILBERT,<br>MARTIN J. CONNORS, and<br>JACK D. WILLIAMS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real or personal, constituting or derived from proceeds defendants obtained directly or indirectly as a result of the said violations including, but not limited to, a Forfeiture Money Judgment.

C.     If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendants:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third party;

(3)     has been placed beyond the jurisdiction of the court;

    (4)     has been substantially diminished in value; or

    (5)     has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

## FORFEITURE ALLEGATION-2

A.    The allegations contained in count 12 of this indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

B.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 1347, set forth in count 12 of this indictment, the defendant,

### G. FORD GILBERT,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or personal, constituting or derived from proceeds the said defendant obtained directly or indirectly as a result of the said violations and any property, real or personal, involved in the offenses, and any property traceable to such property including, but not limited to, a Forfeiture Money Judgment.

C.    If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant:

    (1)     cannot be located upon the exercise of due diligence;

    (2)     has been transferred or sold to, or deposited with, a third party;

    (3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982(a)(7).


A TRUE BILL:

_____
Foreperson


_____
LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY


_____
Jonathan S. Ross
Assistant United States Attorney


_____
R. Randolph Neeley
Assistant United States Attorney